IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

STEPHEN GRIEGO                                                          PLAINTIFF

v.                              Case No. 4:20-CV-01309

LENNOX INDUSTRIES, INC.                                                 DEFENDANT

<u>ORDER</u>

This case involves allegations of wrongful termination.  Defendant Lennox Industries, Inc.

fired Plaintiff Stephen Griego because, in Lennox's view, Mr. Griego missed work too frequently.

Mr. Griego says many of his absences were caused by attending medical appointments for his

mental and physical disabilities.  Mr. Griego thus contends that Lennox violated the Family and

Medical Leave Act and the Americans with Disabilities Act by firing him.  Lennox has moved for

summary judgment.[1]  For the reasons given below, the Court GRANTS Lennox's Motion.

BACKGROUND[2]

Mr. Griego worked in Lennox's Stuttgart, Arkansas, facility two separate times.  His first

stint of employment spanned from 2003 to 2017; Lennox terminated Mr. Griego for excessive

absences.  After he was fired by Lennox for the first time, Mr. Griego spent a little over one year

working various jobs.  Then, at the end of 2018, Lennox found itself extremely short-staffed.  So

---

[1] Def.'s Mot. for Summ. J. (Doc. 33).

[2] This Background Section is primarily composed of undisputed facts.  To the extent there are genuine disputes of
fact, the Court resolves them in favor of the nonmoving party, Mr. Griego.  *See Bruning v. City of Omaha*, 6 F.4th
821, 824 (8th Cir. 2021).  Resolving disputes in favor of the nonmoving party typically means adopting that party's
version of the disputed fact.  In this case, however, Mr. Griego and his attorneys have made it somewhat difficult to
pin down exactly what Mr. Griego considers the facts of this case to be.  A large portion of Mr. Griego's deposition
testimony is him stating that he doesn't remember specific information about his time at Lennox.  *See, e.g.*, Ex. 1
(Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 39:4–7, 44:2–13, 54:16–25, 66:20–24, 84:17–
85:7, 89:3–7, 103:13–19.  And Mr. Griego's summary-judgment papers contain certain admissions and denials that
are at the very least in tension with each other, if not directly conflicting.  *See* Pl.'s Resp. to Def.'s Statement of Facts
(Doc. 41) ¶¶ 40–46.  Of the many possible readings of this record, the Court adopts the version that is the most
favorable to Mr. Griego's case.  And even under that most favorable version of the record that a rational juror could
reach, Lennox is still entitled to summary judgment.

it rehired Mr. Griego.  This second stint of employment lasted until October of 2019, when Mr. Griego was once again fired for (in Lennox's view) a lackluster attendance record.  Mr. Griego's claims in this case are based solely on the second termination.  But his first stint with Lennox and the interim period of time where he worked other jobs are nonetheless relevant.  So the Court begins in 2003, when Mr. Griego first joined Lennox.

## I.    First Stint of Employment with Lennox

Lennox first hired Mr. Griego in 2003.[3]  When he joined the company, Mr. Griego had the option of working as a "brazer" or an "assembler."[4]  The record doesn't quite explain the specifics of each job.  It appears that brazing involves using fire (i.e., torches) and is a more preferable assignment than assembling.[5]  Mr. Griego didn't have the benefit of that knowledge in 2003, however, and he chose to be an assembler.[6]  Assemblers and brazers each work on "lines," which the Court understands to be assembly lines or something very similar to assembly lines.  For the vast majority of his first stint of employment, Mr. Griego worked on one specific line and was primarily supervised by Phillip Bell.[7]  For the last few years of his first stint of employment, Mr. Griego was a "floater," meaning that he was not permanently assigned to one particular line.[8]  Instead, his assigned line would regularly change as each line's manpower needs fluctuated.[9]

---

[3] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 23.

[4] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 22:18–19.

[5] *Id.* at 22:19–21, 67:17–24.

[6] *Id.* at 22:19–21.

[7] *Id.* at 24:5–21, 51:14–22.

[8] *Id.* at 24:5–24.

[9] *Id.*

Mr. Griego's time with Lennox got off to a rocky start.  On one of his first days, Mr. Griego had a run-in with a line supervisor, Charles Brown.[10]  Mr. Brown saw Mr. Griego holding a brazing torch; Mr. Griego, an assembler, was not supposed to be using such torches.[11]  Mr. Brown tried to get Mr. Griego in trouble for improperly using the brazing torch.[12]  Mr. Griego explained that he had simply been handing the torch to a coworker who was a brazer and therefore needed the torch.[13]  Apparently, this interaction made Mr. Brown feel stupid and, as a result, Mr. Brown then held an approximately fourteen-year grudge against Mr. Griego.[14]  Whenever Mr. Griego was assigned to Mr. Brown's line (as a floater during the final years of Mr. Griego's first stint of employment), Mr. Brown would berate Mr. Griego.[15]  Mr. Griego indicates that Mr. Brown's behavior was fairly typical of how other line supervisors treated Mr. Griego.[16]

Mr. Griego's displeasure with the way some of the line supervisors spoke to him did not impact the quality of his work.  Mr. Griego says that he was a hard worker who got the job done.[17]  And there's nothing in the record to dispute that, when he was at work, Mr. Griego generally did his job well.  What did cause problems, however, was the fact that Mr. Griego missed a lot of work.

---

[10] *Id.* at 33:18–21, 67:15–68:12, 131:14–22.

[11] *See id.* at 67:15–22.

[12] *Id.* at 67:20–22.

[13] *Id.* at 67:17–24, 131:14–21.

[14] *See id.* at 131:14–22.  The only rational read of the record is that this interaction with Mr. Brown took place "when [Mr. Griego] first started" his first stint of employment with Lennox.  *Id.* at 67:17.  Mr. Griego testified that he was only supervised by Mr. Brown when Mr. Griego was "still filling in" as a floater, and Mr. Griego worked as a floater only during his first stint of employment.  *Id.* at 68:2–6, 99:13–15.

[15] *See id.* at 131:23–132:18.

[16] *See id.* at 43:18–44:1, 132:15–25, 184:1–194:9 (indicating that Mr. Griego had several negative interactions with Charles Brown, Phillip Bell, and Phillip Prine, among others, during his first stint of employment).  *But see id.* at 141:20–23, 185:23–186:4 (suggesting that Phillip Bell was not particularly harassing or otherwise rude to Mr. Griego during Mr. Griego's first stint of employment).

[17] *See id.* at 64:8–24.

Mr. Griego would frequently miss, or arrive late to, scheduled shifts. Mr. Griego says that his absences were largely related to attending medical appointments. Mr. Griego's medical conditions are both physical and mental. Physically, Mr. Griego has leg problems. A childhood surgery left a scar on Mr. Griego's leg that can tear open and bleed.[18] This issue used to occur with such frequency that Mr. Griego had to be discharged from the United States Army.[19] Additionally, Mr. Griego's leg causes him constant pain, makes him walk with a limp, and requires him to wear a leg brace.[20] Mentally, Mr. Griego suffers from Post-Traumatic Stress Disorder. Mr. Griego's PTSD is primarily the result of witnessing a serious car accident shortly after he began working for Lennox.[21]

Lennox's written attendance policy operated on a point system.[22] Each point was recorded as an "occurrence."[23] An employee who arrived late or left early, but still worked more than four hours of his or her shift, would receive 0.5 occurrences.[24] If an employee missed a full day or showed up but worked less than four hours of his or her shift, then that employee would receive

---

[18] *Id.* at 15:20–16:12.

[19] *Id.* at 16:18–17:11.

[20] *Id.* 80:9–11, 107:11–108:2.

[21] *Id.* at 34:18–35:16.

[22] *Id.* at 68:18–25. During Mr. Griego's deposition, it appears that he and opposing counsel were reviewing only the written policy that was in effect during Mr. Griego's second stint of employment. *See id.* at 60:25–61:6. But at the time of the deposition, Mr. Griego was asserting wrongful-termination claims for both stints of employment, so the attendance policies for both stints were relevant. *See* Am. Compl. (Doc. 10) ¶¶ 15–16, 20–23; Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34) at 13–24. Neither party has made any differentiation in the attendance policies in effect during the first and second stints of employment. Indeed, Lennox's former Director of Human Resources, who retired before Mr. Griego even began his second stint of employment with Lennox, testified about the point system. *See* Ex. 2 (Bonnette Dep.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-2) at 6:9–10, 8:22–10:2. Essentially, everyone seems to be comfortably operating on the assumption that the attendance policy was materially the same during both stints of employment.

[23] *See* Ex. 5 (Attendance Policy, Appendix C) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 264; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 10.

[24] *See* Ex. 5 (Attendance Policy, Appendix C) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 264; *see also* Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 2–3 (attributing 0.5 occurrences to late arrivals).

1.0 occurrences.[25]   A multi-day span of absences would be consolidated into 1.0 occurrences so long as the absences were for medical reasons and the employee produced a doctor's note.[26]   An employee was expected to call in and notify Lennox of an absence at least thirty minutes before the start of his or her scheduled shift.[27]   An employee who missed a full day and failed to call in would receive 1.5 occurrences.[28]   An employee could be terminated for reaching 5.0 occurrences within a twelve-month period.[29]

The written attendance policy contained certain excuses that would allow employees to avoid accruing occurrences.  Chief among these excuses, for purposes of this case, was the twelve weeks of unpaid leave offered pursuant to the Family and Medical Leave Act (FMLA).[30]   If a Lennox employee was eligible for protection under the FMLA and could show that the absence or tardiness was due to the employee's relevant medical condition, then the absence or tardiness would not be counted in the occurrence calculation.  An employee was "eligible" under the FMLA

---

[25] *See* Ex. 5 (Attendance Policy, Appendix C) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 264.

[26] *See id.*

[27] *See id.*

[28] *See id.*

[29] *See id.* at 265.  The policy contemplated (but did not require) a series of written warnings to be issued as an employee's number of occurrences increased.  *Id.*  There is one such document in the record, purportedly issued to (and signed by) Mr. Griego on July 8, 2017.  Ex. 2 (Last Chance Agreement) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 249.  Mr. Griego is adamant, however, that the document (including his signature) is a forgery.  *See* Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 31:17–32:14. For purposes of summary judgment, then, no such document was issued to Mr. Griego in 2017.  *See supra* note 2. There's no evidence of any similar written warning given to Mr. Griego during his second stint of employment.

[30] *See* Ex. 5 (Attendance Policy, Appendix C) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 261.  An employee could also take advantage of Lennox's short-term-disability leave.  *See id*.  Mr. Griego did take such leave at various points throughout his time with Lennox.  *See* Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 34:9–12.  That's not relevant to this case; the relevant question is whether Mr. Griego's absences were (or should have been) covered by FMLA leave.

if he or she had worked at Lennox for more than a year (in total) and had worked 1,250 hours in the preceding twelve months.[31]

Because FMLA eligibility is tied to hours worked in the preceding twelve months, a long-term employee like Mr. Griego could undergo several FMLA-eligibility changes over the course of employment.   Indeed, throughout Mr. Griego's fourteen-year first stint of employment, the record shows multiple eligibility changes.[32]   (To be clear, that means that at least at some points during Mr. Griego's first stint of employment, Mr. Griego asked for and received FMLA leave.[33]) FMLA eligibility was of particular importance for Mr. Griego, who missed a fair amount of work for doctor's appointments: A doctor's note would completely excuse an employee's absence only if the employee was eligible for FMLA leave and the absence was related to the employee's FMLA-qualifying health condition.[34]  Otherwise, even with the benefit of a doctor's note, absences or late arrivals still factored into the occurrence calculation.[35]

Despite Lennox's fairly strict written attendance policy, the powers that be at Lennox's Stuttgart facility were quite lenient in their enforcement of the attendance policy.  Mr. Griego testified that if an employee was a "good worker," then management would "work with" that employee to avoid terminating that employee.[36]  This leniency apparently arose from necessity—

---

[31] *See* 29 U.S.C. § 2611(2)(A).

[32] *See* Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶¶ 24–27.

[33] *Id.*  For example, Lennox certified Mr. Griego as FMLA eligible from July 27, 2016, to January 27, 2017.  *Id.* ¶ 25.  Then, at the beginning of 2017 (the last year of his first stint of employment), Mr. Griego became ineligible "because he had not worked 1,250 hours in the prior 12 months . . . ."  *Id.* ¶¶ 26–27.

[34] *See* Ex. 5 (Attendance Policy, Appendix C) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 261–62.

[35] *See id.* at 264.

[36] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 27:18–22, 64:5–16, 69:11–20, 74:23–75:5, 77:18–78:3.  One way in which management would work with a good employee is by using that employee's vacation days to make up for otherwise unexcused absences.  *Id.* at 27:18–22.  Mr. Griego feels as though he got a raw deal the first time he was fired because, at the time of that first termination, he had approximately two weeks of

chronic employee-absenteeism issues meant that strict enforcement of the written policy would cause so many terminations that the business could not function properly.[37]

Even still, Lennox could reach, and did reach, a breaking point.  In 2017 alone, Mr. Griego accrued 18.5 occurrences by July 13.[38]  Then, "after an unexcused absence on September 18, 2017, Lennox decided to terminate [Mr.] Griego's employment for excessive absenteeism."[39]

## II.    Non-Lennox Employment

During his hiatus from Lennox, Mr. Griego worked a handful of different jobs and also obtained a certification in welding.[40]  For purposes of this case, his only relevant job was working for "Dish."[41]  On a visit to a customer's home, Mr. Griego and the customer were attacked by a random man.[42]  Mr. Griego was shaken by the experience, which only exacerbated his PTSD.[43] Shortly after this incident, Mr. Griego quit his job with Dish and began looking for a new job.[44] Meanwhile, Lennox's employee-absenteeism problems had worsened.  The company found itself so shorthanded that Mr. Bell (one of Mr. Griego's supervisors the first time around) invited Mr. Griego back to the company.[45]  Mr. Griego took Mr. Bell up on the offer and rejoined Lennox on

---

vacation days that could have been, but were not, used to negate some of his absences.  *Id.* at 27:11–24; *see also* Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 5.

[37] *See* Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶¶ 3–4.

[38] *See* Ex. 6 (Lewis Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-6) ¶ 13.

[39] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 31.

[40] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 46:20–47:8.

[41] *Id.* at 48:4–21.

[42] *Id.* at 4:17–24.

[43] *Id.* at 48:12–18.

[44] *Id.* at 48:19–49:10.

[45] *Id.* at 47:9–10; Ex. 1 (Baker Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-1) ¶ 16.

December 9, 2018.[46]  Mr. Griego's attendance issues from his first stint of employment did not come up in any conversations about rejoining the company.[47]

### III.   Second Stint of Employment with Lennox

Mr. Griego's second stint of employment with Lennox went much like the first.  There were a few differences, of course.  The second time around he chose to work as a brazer.[48]  He was no longer a "floater," instead consistently working on a few lines.[49]  But by and large, history repeated itself.

The supervisors still largely lacked decorum when Mr. Griego came back to Lennox.  Most, if not all, of his supervisors regularly berated Mr. Griego.[50]  One supervisor with whom Mr. Griego worked quite frequently, Phillip Prine, would try to instigate fights with Mr. Griego.[51]  Mr. Prine at one point went so far as to tell Mr. Griego, "The only disability you have is retardation."[52]  And Mr. Griego was still a hard worker.  But his physical conditions made brazing difficult.

Part of Mr. Griego's job involved positioning heavy pieces of metal.[53]  Mr. Griego said the carts that the employees were given to push around the heavy pieces of metal were insufficient to do the job well.[54]  To make matters worse, Mr. Griego's leg brace would occasionally malfunction and, because Mr. Griego couldn't bend his leg well, make it difficult for Mr. Griego to do his job.[55]

[46] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 33.

[47] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 51:23–52:6.

[48] *Id.* at 23:8–9.

[49] *Id.* at 99:5–15.

[50] *See id.* at 130:21–25, 132:15–25.

[51] *See id.* at 65:14–66:19, 134:4–5, 138:10–19.

[52] *Id.* at 138:6–139:5.

[53] *See id.* at 109:20–110:2, 140:22–141:2.

[54] *Id.*

[55] *Id.* at 148:23–149:10.

Despite these issues, Mr. Griego never requested (and seemingly did not want) an alteration to his workstation or a lightening of his workload.[56]   He was also never given any physical work restrictions by a medical professional.[57]

Mr. Griego's biggest problem, however, was that he once again missed a lot of work. Lennox's written attendance policy—including the provisions related to FMLA leave—had not changed in any material respect since Mr. Griego's first stint of employment.[58]  Multi-day medical absences were still consolidated.[59]  And, as far as Mr. Griego knew, Lennox managers were still willing "to work with" "a good worker" on attendance issues.[60]  Mr. Griego was generally familiar with those written and unwritten policies throughout his second stint of employment with Lennox.[61]  Mr. Griego was not familiar, however, with the intricacies of FMLA eligibility.

Everyone now agrees that Mr. Griego did not actually become FMLA eligible during his second stint of employment until June 19, 2019, when he reached the requisite 1,250 hours worked.[62]  But at the time, Mr. Griego thought that he was instantly FMLA eligible upon rejoining Lennox because he was FMLA eligible during his first stint of employment.[63]  It appears Mr. Griego was laboring under the mistaken assumption that once a person is FMLA eligible, that person remains FMLA eligible forever.  He says that he asked either Lisa Keffer (Lennox's on-

---

[56] *See id.* at 108:12–25.  The only accommodation request asserted by Mr. Griego in this litigation is that he sought time off to attend doctor's appointments—i.e., submitted doctor's notes.  *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 42) at 2, 6–7; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 49.

[57] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 89:3–7, 108:12–25, 116:10–13.

[58] *See supra* note 22.

[59] *See* Ex. 5 (Attendance Policy, Appendix C) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 264.

[60] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 55:19–25.

[61] *See id.* at 55:1–25.

[62] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 37.

[63] *See* Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 114:17–115:9.

site nurse) or a supervisor about using FMLA leave every time he submitted a doctor's note.[64]   Mr.

Griego was told each time (for absences both before and after June 19, 2019) that he was not

eligible for FMLA leave.[65]   Whatever Mr. Griego thought about the correctness of these responses,

he never obtained, and therefore never submitted, the paperwork necessary to become certified as

an FMLA eligible employee.[66]

Mr. Griego's attendance became a real issue for Lennox.[67]   Lennox's records showed that,

by October of 2019, Mr. Griego had shown up late to work fourteen times and left early six times.[68]

Most eye-opening, however, was that Mr. Griego had racked up a total of twenty-four unexcused,

full-day absences in 2019.[69]   Mr. Johnson summoned Mr. Griego to the Human Resources offices

on October 7, 2019.[70]   Mr. Johnson told Mr. Griego that he was missing work too often.[71]   Mr.

---

[64] *Id.* at 115:10–16, 117:2–12, 118:14–119:10; *see* Ex. 5 (Keffer Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-5) ¶ 2.

[65] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 117:2–9.

[66] *See id.* at 114:25–115:12.

[67] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 40 (Mr. Griego admitting that supervisors at Lennox "were on him about attendance").   An employee's attendance was tracked by a software system.   Ex. 1 (Baker Dep.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 48-1) at 18:2–21.   Mr. Griego was given a badge to scan when he arrived at his workstation on the line.   *See id.* at 17:5–24.   Apparently, Mr. Griego's badge wasn't very reliable; the relevant scanners would frequently not recognize his badge.   *See* Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 95:8–97:19.   In passing, Mr. Griego suggests that these badge issues undermine the reliability of Lennox's attendance-tracking software.   Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶¶ 35, 44.   The theory seems to be that it is possible that Mr. Griego was actually at work some of the days that Lennox counted as occurrences.   That theory fails to make a difference in this case for two primary reasons.   First, Mr. Griego couldn't identify a single time at which his attendance was inaccurately recorded.   That is, he never identified a day on which he was at work but that the attendance system marked him as absent.   So any dispute as to the reliability of the attendance record would not be genuine.   Second, even if Mr. Griego had offered such evidence, it wouldn't make any difference for his claims in this case.   If Lennox fired him based on inaccurate attendance data, that wouldn't be proof that Lennox fired Mr. Griego for FMLA-protected absences, discriminated against Mr. Griego because he was disabled, or retaliated against Mr. Griego because he requested an accommodation.

[68] Ex. 1 (Baker Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-1) ¶ 24; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 35.

[69] Ex. 1 (Baker Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-1) ¶ 24; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 35.

[70] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 101:14–25; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 40.

[71] *See* Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 101:4–13.

Griego asked to be told the specific days on which he was counted absent, claiming that his absences were largely due to attending medical appointments at the Veteran Affairs (VA) medical center.[72]  Mr. Johnson declined to detail the missed workdays for Mr. Griego.[73]  Instead, Mr. Johnson said that nobody cared that Mr. Griego had served in the military.[74]  Mr. Johnson also said that Mr. Griego "had no business having [his] ass where [he] had it when [he] was attacked . . . ."[75]  With the benefit of hindsight, Mr. Griego thinks that Mr. Johnson mistakenly believed that one of Mr. Griego's absences, which was labeled in the attendance record as "Court," was due to Mr. Griego being in legal trouble.[76]  In reality, Mr. Griego had been subpoenaed to appear in court as a victim of and/or witness against the person who attacked him and a customer while he worked for Dish.[77]

Mr. Johnson suspended Mr. Griego.[78]  Shortly thereafter, Mr. Johnson got together with Ms. Keffer to conduct an in-depth review of Mr. Griego's attendance record and determine whether to terminate Mr. Griego's employment.[79]  Only ten of Mr. Griego's forty-four unexcused absences (nine full-day; one early departure) were recorded as being for medical purposes.[80]  Of those ten

---

[72] *Id.* at 101:9–13.

[73] *Id.* at 103:4–5.

[74] *Id.* at 101:11–13.

[75] *Id.* at 101:4–8.

[76] *Id.* at 137:1–23; Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 3.  Mr. Griego submitted paperwork from the prosecuting attorney's office that indicated he would need three days off work—August 13, August 26, and August 27, 2019.  Ex. 6 (Absence Excuse Notes) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 267.  It's not clear exactly why, but only August 27 was recorded as an absence in Mr. Griego's attendance record.  *See* Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 3.  And this absence was later excused.  *See* Ex. 1 (Baker Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-1) ¶ 26.

[77] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 82:5–83:3.

[78] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 40.

[79] Ex. 5 (Keffer Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-5) ¶ 14; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶¶ 40, 42.

[80] The ten medical-related absences in 2019 were on January 18, April 1, April 18, April 24, May 8, June 25, June 26, June 27, August 7, and September 23.  Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at

days, five took place before Mr. Griego was FMLA eligible at all.[81]  And while the other five took

place after Mr. Griego became FMLA eligible, Lennox had never certified Mr. Griego as FMLA

eligible during his second stint of employment.  So, when Mr. Johnson and Ms. Keffer conducted

their pre-termination review, Lennox's written policy did not require excluding or otherwise

ignoring any of these ten medical-related absences.  Nevertheless, Mr. Johnson and Ms. Keffer

"consolidated" all ten of Mr. Griego's medical-related absences into 2.0 occurrences.[82]   To

effectuate this consolidation, Mr. Johnson and Ms. Keffer left unchanged two "Personal Illness"

absences (January 18, 2019, and April 1, 2019) with 1.0 occurrences attributed to each absence.[83]

Occurrence points for the other eight absences for which Mr. Griego provided a doctor's note were

removed from the system.[84]  Additionally, Mr. Johnson wrote off the remaining early departures,

one of the late arrivals, and the one day that Mr. Griego missed for court proceedings.[85]

---

81:5–91:24 (reviewing doctor's notes); *see also* Ex. 6 (Absence Excuse Notes) to Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 266–274.  There is no doctor's note for January 18, 2019, in the record, but it is marked as a "Personal Illness" day on the attendance record.  *See* Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 2.  There is no record evidence of any other absences being for medical-related reasons.  *See* Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 73:24–74:3, 79:15–81:4, 91:7–23; *see also* Ex. 5 (Keffer Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-5) ¶ 13; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 22.

[81] Mr. Griego became FMLA eligible on June 19, 2019.  Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 37.  So his January 18, April 1, April 18, April 24, and May 8 medical-related absences, *see supra* note 80, occurred before he became FMLA eligible.

[82] Ex. 5 (Keffer Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-5) ¶ 13.  Mr. Griego's denial of this fact, Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 43, does not raise a genuine dispute of fact.  The portions of the record cited are not relevant to whether Mr. Johnson and Ms. Keffer consolidated Mr. Griego's medical-related absences during their pre-termination review.

[83] *See* Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 2.

[84] *See id.* at 2–3.  Seven of these eight absences were marked "Absent - Personal Illness Continued," while one (May 8, 2019) was marked "Early Out - LOW Excused."  *Id.*  The record doesn't reveal the finer points of Mr. Johnson and Ms. Keffer's "consolidation" process.  There is no evidence as to why the January 18 and April 1 absences, specifically, were chosen as the two absences to provide the 2.0 occurrence points.  It seems that, after deciding that a total of 2.0 occurrences was a fair number for Mr. Griego's medical-related absences, Mr. Johnson and Ms. Keffer simply left the first two medical-related absences appearing on the attendance record unchanged so that only 2.0 total medical-related occurrence points would be calculated in the system.

[85] Ex. 1 (Baker Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-1) ¶¶ 26–28.  Mr. Griego's denial of this fact, *see* Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 43, does not raise a genuine dispute of fact.  *See supra* note 82.

After Mr. Johnson and Ms. Keffer's consolidation and write-offs, Mr. Griego's attendance record still showed sixteen unexcused, full-day absences and thirteen late arrivals—for a total of 22.5 occurrences.[86]   And that was well above what Lennox was willing to deem acceptable, even when considering the Stuttgart facility's culture of leniency.   So Mr. Johnson decided to terminate Mr. Griego.[87]   A little under one year later, on September 22, 2020, Mr. Griego filed this lawsuit in Arkansas state court.[88]   Lennox removed the case to federal court on November 5, 2020.[89]

---

[86] *See* Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 2–3.   The attendance record shows 23.0 occurrences, but 0.5 of those arose from an early departure on October 7, 2019.   *See id.* at 3.   The only rational way to read that is as Mr. Griego being suspended (and therefore leaving) before his shift was complete.   The record suggests that Mr. Johnson did not consider that particular incident when deciding whether to terminate Mr. Griego.   *See id.* at 2–3 (listing a total of seven early departures); Ex. 1 (Baker Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-1) ¶¶ 24, 28 (stating that there were "6 unapproved early departures").

The sixteen unexcused, full-day absences number requires some explanation.   In his Declaration, Les Baker (Mr. Johnson's supervisor at the time of the termination) stated that Mr. Johnson and Ms. Keffer's pre-termination reductions resulted in fourteen full-day unapproved absences.   Ex. 1 (Baker Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-1) ¶ 26.   Mr. Baker arrived at the number fourteen by starting with Mr. Griego's twenty-four full-day absences, then subtracting all ten full-day absences for which Mr. Griego produced either a doctor's note or the court subpoena.   *See id.* ¶¶ 24, 26.   Subtracting all ten full-day absences doesn't accurately reflect Mr. Griego's final attendance record, however, because Mr. Johnson and Ms. Keffer kept 2.0 occurrences on file for January 18, 2019, and April 1, 2019.   *See* Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 2.   So, in reality, the attendance record reflects only eight full-day absences being erased, with sixteen unexcused full-day absences remaining in the occurrence calculation.   *See id.*   The Court uses the higher number of sixteen, even though it is less favorable to Mr. Griego, for two related reasons.   First, the Court has already concluded that Mr. Griego's dispute as to the reliability of the attendance record (i.e., his dispute of Mr. Baker's calculation) is not genuine.   *See supra* note 67.   And second, a rational juror presented with the attendance record could conclude only that the attendance record shows sixteen unexcused, full-day absences.

[87] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 47.   Mr. Griego at some points admits that he was first suspended, then Lennox conducted a review of his attendance record, then Mr. Griego was fired.   *See id.* ¶¶ 40–42.   But he at other times indicates that he believes that Mr. Johnson fired him in the room on October 7, 2019, and that the purported post-attendance review was a coverup.   *See id.* ¶¶ 43, 45.   There is no support in the record for the latter theory.

[88] Compl. (Doc. 2).   At some point during the suspension-to-termination decision-making process, Mr. Griego called Lennox's ethics hotline to file a complaint that suspending or terminating Mr. Griego would be disability discrimination.   *See* Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 41.   Mr. Baker testified that Mr. Griego's hotline complaint prompted Mr. Baker to "review[] the documentation" upon which Mr. Johnson based his decision to fire Mr. Griego; Mr. Baker "agreed with the termination decision."   Ex. 1 (Baker Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-1) ¶ 32.

[89] Notice of Removal (Doc. 1).

**DISCUSSION**

Mr. Griego's claims in this case arise only from his second stint of employment.  He says that Lennox violated the FMLA and the Americans with Disabilities Act (ADA).  As discussed below, all of Mr. Griego's claims fail.

I. **FMLA**

Lennox presses two main arguments on summary judgment.  First, Lennox says that the FMLA shouldn't apply to Mr. Griego's case at all because he didn't take the steps necessary to benefit from the statute.  Second, Lennox contends that, even if the FMLA does apply to Mr. Griego's case, there was no FMLA violation because Mr. Griego's termination was not based on FMLA-protected absences.  Lennox's first argument fails; the FMLA does apply to at least some of Mr. Griego's medical-related absences.  Lennox's second argument, however, is a winning one.  Mr. Griego's termination did not violate the FMLA.

A. **Protected Absences**

The FMLA entitles eligible employees to twelve workweeks of unpaid, job-protected leave throughout the year for, among other things, "a serious health condition that makes the employee unable to perform" his or her job.[90]  An eligible employee is allowed to use FMLA leave to attend a doctor's appointment that is related to his or her serious health condition.[91]  Mr. Griego became an eligible employee on June 19, 2019.[92]  And he suffered from serious health conditions—his leg

---

[90] 29 U.S.C. § 2612(a)(1)(D).

[91] *See Phillips v. Mathews*, 547 F.3d 905, 910 (8th Cir. 2008).

[92] Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 37.

issues and PTSD.[93]   So there's really no disputing that Mr. Griego's post-June 19 doctor's appointments fall squarely within the scope of the FMLA.

Lennox argues that Mr. Griego didn't take his opportunity to benefit from the FMLA during his second stint of employment.   Specifically, Lennox contends that Mr. Griego has no viable FMLA claims because he never submitted the paperwork necessary to have his absences excused by the FMLA.[94]   In Lennox's view, the FMLA therefore has no relevance to any of Mr. Griego's absences, whether for a doctor's appointment or something else.   While Lennox is right that Mr. Griego never submitted the formal FMLA paperwork, Lennox is wrong to think that is the end of the matter.   Mr. Griego did not have to "invoke the FMLA by name" or otherwise use some set of magic words to obtain the FMLA's protections.[95]   Lennox's FMLA duties were "triggered when [Mr. Griego] provide[d] enough information to put [Lennox] on notice that [Mr. Griego] may be in need of FMLA leave."[96]

The record, taken in the light most favorable to Mr. Griego, shows that he asked Ms. Keffer or other supervisors about FMLA leave every time he submitted a doctor's note—which occurred numerous times before and after June 19, 2019.[97]   So, in both the time leading up to and the time after Mr. Griego officially became FMLA eligible, Lennox knew that Mr. Griego was taking time

---

[93] Defendants make no argument that Mr. Griego's medical conditions weren't sufficiently serious for purposes of the FMLA.   That makes sense, given that they had granted Mr. Griego FMLA leave during his first stint of employment for such conditions.   *See id.* ¶¶ 24–25.

[94] *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34) at 13–15.

[95] *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000).

[96] *Id.* (citation omitted).

[97] *See supra* pp. 9–10.   It's possible that Mr. Griego was trying to say that, in his mind, submitting a doctor's note was the equivalent of asking for FMLA leave.   Even if that were the correct (i.e., most pro-plaintiff) reading of the record, the Court's conclusion would remain the same.   An employee (who has formerly been certified for FMLA leave due to one or more chronic conditions) submitting ten doctor's notes over ten months, including five notes in a three-month span after the employee became FMLA eligible, is sufficient notice of the possible need for FMLA leave.   *See Thorson*, 370 F.3d at 381.

off to attend doctor's appointments.  And by virtue of certifying Mr. Griego for FMLA leave during his first stint of employment, Lennox knew that Mr. Griego suffered from various chronic medical conditions.  So a rational juror could conclude that Lennox knew the medical appointments during Mr. Griego's second stint of employment were related to those same conditions.  That information is sufficient to have put Lennox on notice that Mr. Griego wanted to use FMLA leave during his second stint of employment to excuse his medical-related absences.  At that point, Lennox "could have initiated the FMLA's certification process" if it wanted to protect itself from FMLA abuse, or it could have simply designated Mr. Griego's medical-related absences as FMLA leave.[98]

Thus, at the summary-judgment stage, the Court proceeds as though Mr. Griego's five medical-related absences that occurred after June 19, 2019, were covered by the FMLA.  Now, Mr. Griego has to show that there is a genuine dispute of material fact as to whether Lennox violated the FMLA.

### B.      FMLA Violation

29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided by the FMLA.[99]  Mr. Griego says that Lennox violated this prohibition in a few different ways.  Mr. Greigo's primary argument is that Lennox's decision to terminate him was improperly motivated by his medical-related absences.  Mr. Griego's backup arguments are that Lennox gave him inaccurate information about his FMLA eligibility and that one of his supervisors made negative remarks about Mr. Griego's absences.

---

[98] *Thorson*, 205 F.3d at 381.

[99] 29 U.S.C. § 2615(a)(1).

### 1.    Wrongful Termination

The Eighth Circuit has recognized two ways for an employee to prove a violation of 29 U.S.C. § 2615(a)(1)—an "entitlement" claim and a "discrimination" claim.[100]  For an entitlement claim, the employee must show "the denial of a benefit to which he is entitled under" the FMLA.[101] An entitlement claim does not require proving that the employer acted with malicious intent.[102] An FMLA discrimination claim, on the other hand, requires the employee to show that the employer took an adverse employment action against the employee and "that the employer was motivated by the employee's exercise of" FMLA rights.[103]  FMLA discrimination claims are generally subject to the burden-shifting framework used in Title VII discrimination claims.[104]

It is not clear to the Court whether Mr. Griego's wrongful-termination arguments are meant to advance an entitlement claim, a discrimination claim, or both.  Lennox initially addressed Mr. Griego's wrongful-termination arguments under the FMLA discrimination framework.[105]  But then Mr. Griego's Response Brief and Lennox's Reply Brief seem to muddle the terminology and blend the relevant analyses.[106]  Complicating matters further is that the Eighth Circuit has

---

[100] *See Pulczinksi v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005–06 (8th Cir. 2012).  Another subsection of § 2615, titled "discrimination," creates a third cause of action, which the Eighth Circuit labels a "retaliation" claim.  *See* 29 U.S.C. § 2615(a)(2); *Pulczinksi*, 691 F.3d at 1005–06.  A retaliation claim arises when an employer "discriminate[s] against any individual for opposing any practice made unlawful by" the FMLA.  29 U.S.C. § 2615(a)(2).  It is essentially a whistleblower-protection claim; Mr. Griego does not make any such claim in this case.  The nomenclature of the various FMLA causes of action has been a consistent source of consternation within the Eighth Circuit.  *See Pulczinksi*, 691 F.3d at 1005–06.  In *Pulczinksi*, the Eighth Circuit endeavored to provide some consistency to its FMLA lexicon.  *See id.*  Accordingly, with respect to the FMLA claims in this case, the Court uses the terms "entitlement," "discrimination," and "retaliation," as the *Pulczinksi* panel used those terms.

[101] *Pulczinksi*, 691 F.3d at 1005.

[102] *Id.*

[103] *Id.* at 1006.

[104] *Id.* at 1007.

[105] *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34) at 15–20.

[106] *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 42) at 3–6; Reply in Supp. of Def.'s Mot. for Summ. J. (Doc. 45) at 2–11.

addressed claims of wrongful termination under both the entitlement-claim and discrimination-claim rubrics.[107]  But the choice of framework is not a dispositive issue in this case.  Under either framework, an employer is not liable if it would have made the same decision even if the employee never took FMLA leave.[108]  That means the dispositive question, for summary-judgment purposes, is whether a rational juror could find that Lennox would have kept Mr. Griego as an employee if he did not have the five FMLA-protected absences on his attendance record.

A rational juror could find that Mr. Griego's five FMLA-protected absences "played a part" in Lennox's decision to terminate him.[109]  It is true that a surface-level review of Mr. Griego's attendance record indicates otherwise.  That attendance record contains no occurrences for any medical-related absence that took place after Mr. Griego became FMLA eligible.  But the surface-level review does not reveal the entire story.  Mr. Johnson and Ms. Keffer "consolidated" all of Mr. Griego's medical-related absences into 2.0 occurrences.   And while the 2.0 consolidated occurrences were facially attributed to two absences that took place months before Mr. Griego became FMLA eligible, Mr. Johnson and Ms. Keffer did not conduct an absence-by-absence determination and pick which particular absences should and should not count against Mr. Griego.

The most pro-plaintiff understanding of this consolidation is that Mr. Johnson and Ms. Keffer saw all ten medical-related absences, totaling 9.5 occurrences, and decided to give Mr. Griego an across-the-board discount by lowering the medical-related occurrences to 2.0.  So a

---

[107] *See, e.g.*, *Brandt v. City of Cedar Falls*, 37 F.4th 470, 480 (8th Cir. 2022) (using the discrimination framework); *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 552 (8th Cir. 2021) (acknowledging that "terminating an employee for absences that were FMLA-eligible may establish an entitlement claim"); *Pulczinksi*, 691 F.3d at 1007 (using the discrimination framework); *Phillips*, 547 F.3d at 911–14 (using both frameworks).

[108] *See Evans*, 996 F.3d at 551–52 (FMLA discrimination claim requires proof that FMLA-protected absences were the real reason for the adverse action); *Phillips*, 547 F.3d at 911–12 (no FMLA entitlement liability if the employee "would have been dismissed" anyway).

[109] *Pulczinksi*, 691 F.3d at 1007 (quoting *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 963 n.3 (8th Cir. 2012)).

rational juror could find that Mr. Griego's five FMLA-protected absences were a part of the 2.0 "consolidated" occurrences that remained on the attendance record. That means a rational juror could conclude that Mr. Griego's FMLA-protected absences were a part (albeit a heavily discounted part) of the 22.5 total occurrences that Mr. Johnson had before him when deciding to terminate Mr. Griego for excessive absences.[110]

But Mr. Griego's FMLA-protected absences playing a part in the termination decision isn't enough to get this case past summary judgment. Mr. Griego needs the FMLA-protected absences to have been determinative. Even without the remaining 2.0 medical-related occurrences, Mr. Griego's attendance record would have shown that he accrued 20.5 occurrences in a little over ten months. That is a staggering number, to say the least: An employee following Lennox's written attendance policy would not accrue that many occurrences over the course of four years. To be sure, the record is clear that Lennox's written policy was not strictly enforced at the Stuttgart facility. But there is absolutely no basis for thinking that even the lenient Stuttgart facility would have retained an employee with 20.5 occurrences in less than a year. There is no evidence (aside from Mr. Griego's self-characterized "speculation") that other employees with that many absences were retained.[111] In fact, the only evidence of any other specific termination-or-retention decisions

---

[110] The Court's conclusion that a rational juror could find that Mr. Griego's FMLA-protected absences "played a part" in his termination means that Mr. Griego was able to make out a prima facie case of FMLA discrimination. *Pulczinksi*, 691 F.3d at 1007 (quoting *Marez*, 688 F.3d at 963 n.3). The next two steps of the FMLA discrimination framework—legitimate nondiscriminatory justification and pretext—dispositively favor Lennox because, as discussed below, Lennox would have fired Mr. Griego for excessive non-FMLA protected absences anyway. *See Phillips*, 547 F.3d at 915 (Colloton, J., concurring).

[111] Mr. Griego at one point testified that he knew some other employees "had 15, 20 days" of absences. Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 69:21–25. But then he immediately walked that back by, among other things, admitting that he had no personal knowledge of whether the other employees' absences were excused. *Id.* at 70:1–9, 71:17–20. Indeed, Mr. Griego characterized his own testimony on this point as "mainly speculation or whatever." *Id.* at 72:13–14.

is that, in 2017, Lennox fired Mr. Griego for accumulating (at least) 19.5 occurrences in a little over nine months.[112]

The record also shows that, even without any medical-related absences, Mr. Griego's attendance issues were becoming more pronounced in the time leading up to his suspension and termination. In the three weeks before he was suspended, Mr. Griego had three unexcused full-day absences and three late arrivals.[113] One of those full-day absences and all three of the late arrivals happened within the five days before his suspension.[114] And then, on the very day he was suspended, Mr. Griego added an additional late arrival into the mix.[115] The only rational conclusion to be reached in this case is that Mr. Griego was absent or tardy with such frequency that his (extremely lenient) employer ran out of patience.[116]

In short, a rational juror could only conclude that Lennox would have fired Mr. Griego whether his attendance record in October of 2019 contained no medical-related absences at all (i.e., 20.5 occurrences) or still contained the two "consolidated" medical-related absences (i.e., 22.5 occurrences). Lennox is entitled to summary judgment on Mr. Griego's wrongful-termination FMLA claims.[117]

---

[112] In 2017, Mr. Griego racked up 18.5 occurrences by July and then, in September, he had another full-day unexcused absence, which would be an additional 1.0 occurrences. *See supra* notes 38–39 and accompanying text. It's possible that Mr. Griego had accrued other occurrences between July and September, but the record isn't clear on that point. *See* Ex. 6 (Lewis Decl.) to Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34-6) ¶ 13.

[113] *See* Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 3. The full-day absences occurred on September 19, September 21, and October 2. *Id.* There was also a fourth full-day absence, September 23, but that was excused by a doctor's note and therefore was an FMLA-protected absence for purposes of summary judgment. *Id.*; *see supra* note 80.

[114] *See* Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 3.

[115] *Id.*

[116] The Court again acknowledges Mr. Griego's attempt to undermine the reliability of the attendance record. As already stated, however, even if Lennox fired him based on an inaccurate attendance record, that is not proof that Mr. Griego was fired for taking FMLA leave. *See supra* note 67.

[117] Mr. Griego argues that summary judgment is inappropriate because Lennox bears the burden of proving that it would have fired Mr. Griego absent the FMLA-protected absences. *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 42) at 5–6. It is true that the Eighth Circuit has purportedly placed that burden on the employer when

## 2.     Inaccurate Information and Negative Remarks

Mr. Griego's remaining two FMLA arguments are unavailing.  Both arguments—that Lennox incorrectly told him that he was ineligible for FMLA leave after June 19, 2019, and that a supervisor made negative comments about his absences—are asserted as bases of entitlement claims.[118]  Assuming arguendo that either of these actions did deprive Mr. Griego of an FMLA benefit, summary judgment in favor of Lennox is still appropriate.  That is because "[t]he FMLA 'provides no relief unless the employee has been prejudiced by the violation.'"[119]  So Mr. Griego must show that a rational juror could find, for example, that he was "denied compensation or benefits," or that he was "deterred" from taking FMLA leave to which he was otherwise entitled.[120]  The only possible prejudices to Mr. Griego in this case would be either (1) he didn't take leave because he thought that he would be disciplined for the absences or (2) he did take leave but was then fired for being absent.

No rational juror could find that Mr. Griego was harmed by being given inaccurate information about his FMLA eligibility.  There is no evidence that Mr. Griego canceled, rescheduled, or otherwise missed a doctor's appointment because he thought the absence would

---

addressing FMLA entitlement claims arising from a termination based on FMLA-protected absences.  *See Phillips*, 547 F.3d at 911 (citing *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 978–79 (8th Cir. 2005)).  But that doesn't preclude summary judgment for an employer.  Indeed, in *Phillips*, the Eighth Circuit affirmed summary judgment in favor of the employers when the *employee* "offer[ed] no evidence other than speculation to support a connection between her termination and FMLA leave." *Id.*  That is, the *employee* had failed to create a genuine dispute as to whether the employers' termination decision was caused by the employee's use of FMLA leave.  *Id.*  It was the *employee's* evidentiary shortcomings that the Eighth Circuit relied upon when holding that the employers were entitled to summary judgment on the entitlement claim.  *Id.*  Here, as in *Phillips*, even if "the burden of proof shift[s] to the employer . . . the undisputed facts demonstrate that [Mr. Griego] was discharged for reasons unrelated to the FMLA." *Id.* at 915 (Colloton, J., concurring).  Such a conclusion necessitates summary judgment in Lennox's favor on both the entitlement and discrimination claims.  *Id.*

[118] *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 42) at 1, 4.

[119] *Pulczinksi*, 691 F.3d at 1006 (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

[120] *Id.* at 1007.

be used against him.[121]  (Indeed, Mr. Griego's case is premised, at least in significant part, on the

fact that he went to his appointments with the thought that his absences were excused.)  And, as

discussed in the preceding subsection, no rational juror could find that Mr. Griego was terminated

based on the relevant medical-related absences.  So he wasn't prejudiced by the misinformation in

that way either.

It is true that Mr. Griego contends that a supervisor made negative remarks about Mr.

Griego's medical-related absences.  Specifically, Mr. Griego says that Mr. Bell once threatened to

fire Mr. Griego if he missed work for a doctor's appointment.[122]  First, this particular instance

seems to have occurred during Mr. Griego's first stint of employment and is therefore not relevant

to the claims in this case.[123]  Second, even if this incident did occur during Mr. Griego's second

stint of employment, it wouldn't get Mr. Griego past summary judgment.  Mr. Griego concedes

that he went to the very doctor's appointment that Mr. Bell threatened him over, and there's no

evidence that this interaction with Mr. Bell (or any resulting occurrence on his attendance record)

chilled  Mr.  Griego  from  going  to  future  doctor's  appointments.[124]   So  Mr.  Griego  wasn't

---

[121] As discussed *infra* note 124, unverified interrogatory responses submitted by Mr. Griego's counsel assert that Mr. Griego regularly canceled doctor's appointments.  But, as also discussed *infra* note 124, those unverified interrogatory responses are not evidence.

[122] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 193:20–195:4.

[123] *See id.*; Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 42) at 1 ("Plaintiff abandons the claims based on his first termination under the FMLA.").

[124] Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 193:20–195:4.  Mr. Griego's contrary suggestion in his summary judgment Response Brief does not create a fact question on this point.  *See* Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 42) at 1, 4.  He points the Court to page 203 of his deposition and to his interrogatory responses.  *See id.*; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) at p. 13, ¶ 8.  Page 203 of Mr. Griego's deposition simply contains Mr. Griego's statement that he "believe[s]" that the answers contained in his interrogatory responses were accurate.  Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 203:22–24.  Playing off that, Mr. Griego then cites to the interrogatory responses, which are not even signed by Mr. Griego, much less verified under penalty of perjury.  *See S. Bancorp Bank, N.A. v. Bayer Cropscience LP*, No. 2:09-CV-00136-JLH, 2010 WL 2989845, at *2 (E.D. Ark. July 26, 2010) (refusing to consider unverified interrogatory responses on summary judgment).  And the unverified interrogatory response on which Mr. Griego relies directly conflicts with his deposition testimony.  *Compare* Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 193:20–195:4 (Mr. Griego stating he went to the doctor's appointment that Mr. Bell threatened him about),

prejudiced by missing medical treatment.  And, once again, Mr. Griego would have gotten fired even without consideration of any medical-related absences.

## II.     Americans with Disabilities Act

The ADA makes it unlawful for an employer to discriminate against a disabled employee.[125]  Sometimes, a disabled employee finds it necessary to approach his or her employer and say that, as things currently stand, the employee is unable to do his or her job; but if granted a "reasonable accommodation," the employee will be able to perform his or her job.[126]  When such a situation occurs, and so long as the employee's disability can indeed be reasonably accommodated, the ADA obligates the employer to make such accommodations.[127]  If the employer rejects the request for an accommodation and later fires the employee because the employee is not adequately performing his or her job, then the employer has discriminated against the disabled employee.[128]

The ADA also makes it unlawful to retaliate "against any individual because such individual has opposed any act or practice made unlawful by" the ADA.[129]  Facially, this provision relates only to what are essentially whistleblower-retaliation claims, such as when an employer fires a person who "made a charge, testified, assisted, or participated in" an investigation or proceeding against the employer.[130]  The Eighth Circuit has held, however, that this provision

---

*with* Ex. 1 (Interrog. Resps.) to Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41-1) ¶ 14(2) (stating that Mr. Griego regularly canceled appointments due to Mr. Bell's threats).

[125] 42 U.S.C. § 12112(a).

[126] *See id.* § 12111(8) (protecting employees who, with the benefit of a "reasonable accommodation, can perform the essential functions of" their jobs).

[127] *See Withers v. Johnson*, 763 F.3d 998, 1004 (8th Cir. 2014) ("[D]iscrimination occurs when the employer fails to abide by a legally imposed duty." (citation omitted)).

[128] *See Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2022).

[129] 42 U.S.C. § 12203(a).

[130] *Id.*

prohibits firing an employee who "ma[de] a goodfaith request for an accommodation . . . ."[131] While very similar to the discrimination claim described in the preceding paragraph, there is an important difference: A discrimination claim focuses on the employer's refusal to make an accommodation, whereas a retaliation claim is based on the idea that the employer punished the employee just for asking about an accommodation.

Mr. Griego brings both an ADA discrimination and an ADA retaliation claim.  Both claims are premised on the argument that Mr. Griego's medical-related requests for time off (i.e., his submission of doctor's notes) were requests for Lennox to reasonably accommodate his physical and mental disabilities.[132]

## A.    Discrimination

ADA discrimination claims, including those premised on an employer's failure to accommodate, require the plaintiff to make out a prima facie case of disability discrimination.[133] That means Mr. Griego must show that a rational juror could conclude that he "(1) has a disability within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment action due to his disability."[134]  Mr. Griego is unable to carry his burden of establishing a prima facie case.

---

[131] *Withers*, 763 F.3d at 1004.

[132] Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 42) at 2, 6–7; Pl.'s Resp. to Def.'s Statement of Facts (Doc. 41) ¶ 49.  Mr. Griego briefs no argument that he sought, but Lennox rejected, any alteration to his workstation or lightening of his workload as an ADA accommodation.  Even if he made that argument, there wouldn't be sufficient record support for it.  *See, e.g.*, Ex. 1 (Griego Dep.) to Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 40-1) at 109:13–20, 115:17–116:12, 148:3–10, 150:16–21 (Mr. Griego testifying that he did not want, need, or ask for physical-disability accommodations).  Similarly, Mr. Griego does not brief an ADA discrimination claim based on what he clearly believes were discriminatory comments made by supervisors, including Mr. Prine's comment that Mr. Griego suffered from "retardation."  *See supra* notes 51–52 and accompanying text.  Had such an argument been briefed, it would fail because there's no evidence that any of the derogatory comments were in any way linked to Mr. Griego's termination or were severe enough to create a hostile work environment.

[133] *See Mobley*, 53 F.4th at 456; *Evans*, 996 F.3d at 545, 547.

[134] *Mobley*, 53 F.4th at 456.

As to the disability prong, Lennox concedes (for purposes of summary judgment) that Mr. Griego is disabled within the meaning of the ADA.[135]  But that is as far as Mr. Griego gets.  His case falters on the qualification prong of the prima facie test.  The qualification prong requires Mr. Griego to show that a rational juror could conclude that he "(1) possesses the skill, education, experience, and training the position requires, and (2) can perform the essential job functions, with or without a reasonable accommodation."[136]  Neither party seems concerned with Mr. Griego's skill, education, experience, or training.  But there is significant disagreement about the essential-job-functions part of the qualifications prong.

Mr. Griego, by claiming that Lennox failed to accommodate him, is necessarily arguing that he would have been able to perform the essential functions of his job if Lennox had given him his requested accommodation of excused absences for medical appointments.  Lennox contends that Mr. Griego cannot satisfy the qualification prong because regular, reliable attendance is an essential function of the job.[137]  Mr. Griego calls foul, arguing that his poor attendance record is Lennox's proffered nondiscriminatory reason for terminating him and, accordingly, he should not have to argue about his attendance record at the prima facie stage.[138]  But the Eighth Circuit has repeatedly considered an employee's poor attendance at the prima facie stage of ADA discrimination cases, notwithstanding that poor attendance is the employer's stated reason for firing the employee.[139]  Indeed, the Eighth Circuit recently concluded that a plaintiff making

---

[135] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34) at 24.

[136] *Mobley*, 53 F.4th at 456.

[137] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 34) at 24–25.

[138] Br. in Supp. of Pl.'s Resp. to Def.'s Mot. for Summ. J. (Doc. 42) at 2, 6.

[139] *See Evans*, 996 F.3d at 545–46 ("We have consistently stated that regular and reliable attendance is a necessary element of most jobs.  An employee who is unable to come to work on a regular basis is unable to satisfy any of the functions of the job in question, much less the essential ones.  We must consider an employer's judgment that regular and reliable attendance is an essential function of an employee's job . . . ." (cleaned up)).

arguments strikingly similar to those made by Mr. Griego failed to establish a prima facie case of discrimination.  In *Evans v. Cooperative Response Center, Inc.*, the plaintiff had requested additional FMLA leave as an accommodation to her disability.[140]  The Eighth Circuit concluded that the plaintiff had not made out a prima facie case of disability discrimination, specifically holding that "[i]f an accommodation would leave the employee unable to perform an essential job function—here, regular attendance—[the] accommodation claim fails."[141]

In the case at bar, Lennox's position (at least as the Court understands it) is actually less aggressive than the position approved of by the Eighth Circuit in *Evans*.  Lennox is not saying that Mr. Griego's medical-related absences are what make Mr. Griego unable to perform the essential functions of the job.  Instead, Lennox is saying that Mr. Griego was otherwise unable to perform the job (i.e., he was consistently absent or late for reasons *entirely unrelated* to his medical conditions) and that Mr. Griego's requested accommodation would not in any way have changed that fact.  That is, Lennox is arguing that even if Mr. Griego never missed work for medical-related absences, the 20.5 non-medical occurrences over ten months make it clear that Mr. Griego would still not have been able to attend work regularly and reliably.  Lennox is correct.  To put it in statutory terms: "[W]ith or without reasonable accommodation," a rational juror could only conclude (on this record) that Mr. Griego was never going to be able to "perform the essential functions of the employment position . . . ."[142]

---

[140] 996 F.3d at 547.

[141] *Id.*

[142] 42 U.S.C. § 12111(8).  Even if the Court held off on considering Mr. Griego's non-medical absences at the prima facie stage, those absences would nevertheless become appropriate evidence at later stages of the ADA discrimination analysis.  And, at those later stages, Mr. Griego's non-medical absences would still doom his ADA discrimination claim.

**B.     Retaliation**

Mr. Griego's ADA retaliation claim is out.  To survive summary judgment, the record must allow a rational juror to conclude (1) Mr. Griego "engaged in statutorily protected activity," (2) Lennox "took an adverse action against" Mr. Griego, and (3) "there was a causal connection between the adverse action and the protected activity."[143]   In light of binding Eighth Circuit precedent, the Court concludes that Mr. Griego engaged in "statutorily protected activity" by submitting doctor's notes (which, in his view, was his method of requesting a reasonable accommodation).[144]  And there's no doubt that Lennox took an adverse action against Mr. Griego by terminating him.  But the record reveals absolutely no causal connection between the two.  As the Court has already stated multiple times, a rational juror could not find that Mr. Griego's medical-related absences are what caused him to get fired.  Given that conclusion, it would be an unimaginable stretch for a rational juror to find that Mr. Griego submitting doctor's notes is what spurred Lennox to fire him.

Mr. Griego had been submitting doctor's notes throughout both stints of employment.  Yet, the adverse employment action didn't occur until Mr. Griego was about ten months into his second stint of employment.  And this isn't a straw-that-broke-the-camel's-back situation, where Mr. Griego submitted one last doctor's note immediately before Mr. Johnson decided to fire Mr. Griego.  Two weeks passed between Mr. Griego's final doctor's note and his last day on the job. The significant passage of time between the protected activity (with respect to Mr. Griego submitting doctor's notes, generally, and his final note, specifically) and the adverse action significantly undermines the idea that there was any causal connection between the two.  And Mr.

---

[143] *Withers*, 763 F.3d at 1004–05.

[144] *Id.*

Griego's attendance record during those two weeks doesn't help his case.  He had one full-day, non-medical unexcused absence; he also had four non-medical, unexcused late arrivals in the five-day span leading up to his suspension.[145]  There's simply not sufficient evidence from which a rational juror could find that Lennox retaliated against Mr. Griego for requesting an accommodation.

## CONCLUSION

For the reasons stated in this Order, Lennox's Motion for Summary Judgment is GRANTED.  Judgment will be entered in favor of Lennox, and this case will be closed.

IT IS SO ORDERED this 28th day of March 2023.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[145] Ex. 3 (Attendance Record) to Supp. to Def.'s Mot. for Summ. J. (Doc. 48-3) at 3; *see Withers*, 763 F.3d at 1005 ("[T]iming alone is not sufficient to create a genuine issue of fact, particularly given that [the employer's] proffered reason for the termination arose in the same window of time.").

28